UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN W. HILL,

             Plaintiff,                      CIVIL ACTION NO. 12-13222

             v.                       DISTRICT JUDGE PAUL D. BORMAN

                                    MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

             Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 14, 18)**

Plaintiff John W. Hill challenges the Commissioner of Social Security's ("the Commissioner") final denial of his benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 14, 18); Plaintiff also filed a reply (Dkt. No.19-1). Judge Paul D. Borman referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. No. 3).

**I.**       **RECOMMENDATION**

Because the Administrative Law Judge ("ALJ") failed to properly consider the medical opinion evidence of record with respect to Plaintiff's need to rest, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's motion for summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner for findings consistent with this recommendation.

## II.      DISCUSSION

### A.  *Framework for Disability Determinations*

Under the Social Security Act (the "Act"), Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

-2-

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B.   Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a

-3-

zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

## III.    REPORT

### A.  *Administrative Proceedings*

Plaintiff applied for disability insurance benefits on March 22, 2010, alleging a disability onset date of July 17, 2009 (Tr. 11); the Commissioner denied the application (Tr. 11). Plaintiff appeared with counsel for a hearing before ALJ Michael R. Dunn, who considered the case *de novo* (Tr. 11). In a written decision, ALJ Dunn found Plaintiff was not disabled (Tr. 11-18). Plaintiff requested an Appeals Council review (Tr. 5-7). On May 24, 2012, the ALJ's findings became the Commissioner's final administrative decision when the Appeals Council declined further review (Tr. 1-4).

### B. ALJ Findings

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that he had not engaged in substantial gainful activity since his alleged disability onset date in 2009 (Tr. 13).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: degenerative joint disease of the left ankle,[1] hypertension, mild chronic obstructive pulmonary disease,[2] and plantar fascial fibromatosis (Tr. 13).[3]

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 13-14).

Between steps three and four, the ALJ found Plaintiff had the Residual Functional Capacity ("RFC") to perform:

> Less than the full range of sedentary work[4] . . . . He can lift up to 10
> pounds occasionally, stand and/or walk up to two hours per day and sit for

---

[1] "Osteoarthritis [, also known as degenerative joint disease,] is the most common joint disorder, which is due to aging and wear and tear on a joint." *See* http://www.nlm.nih.gov/medlineplus/ency/article/000423.htm (last accessed January 6, 2014).

[2] "Chronic obstructive pulmonary disease (COPD) is one of the most common lung diseases. It makes it difficult to breathe." *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001153/ (last accessed January 6, 2014).

[3] "Plantar fibromatosis is a rare condition in which benign (non-cancerous) tumors called plantar fibromas grow on the bottom (plantar surface) of the foot. . . . Plantar fibromas are firm masses that grow slowly along the plantar fascia, and they contain excess collagen or fibrotic tissue. . . . [P]lantar fibromatosis rarely [resolves on its own]. . . . In the early stages of this condition, the fibromas are small and do not interfere with the function of the foot. As the fibromas continue to grow, bending the toes becomes more difficult and walking becomes painful." *See* http://www.footvitals.com/ligaments/plantar-fibromatosis.html (last accessed January 6, 2014).

[4] Sedentary work involves:

six hours per day with normal breaks. He requires a sit/stand option but
would not be off task more than 10% of the workday.

(Tr. 14).

At step four, the ALJ found that Plaintiff could perform his past relevant work as a floor
supervisor, shipping (Tr. 17).

Alternatively, at step five the ALJ also found Plaintiff was not disabled, because he could
perform a significant number of jobs in the national economy (Tr. 17-18).

### C. Administrative Record

### 1.     Plaintiff's Hearing Testimony and Statements[5]

In 2001, Plaintiff fell and broke his left ankle; it had been injured before in a 2000 fall
and a 1999 motorcycle accident (Tr. 51). Plaintiff's ankle surgeon told him that he would not
walk again; but, after surgery, he returned to work on crutches (Tr. 59).When he came off his
crutches in 2002, Plaintiff's doctor prescribed a cane; he has used one ever since (Tr. 60).
Plaintiff gained approximately 70 pounds between 2001 and 2005 and weighed around 250
pounds on the hearing date (Tr. 56).

After his surgery, Plaintiff continued to work as a pay logistics supervisor (Tr. 51-54).
His job responsibilities included supervising employees, performing inventory, and completing

---

lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like
docket files, ledgers, and small tools. Although a sedentary job is defined as one which
involves sitting, a certain amount of walking and standing is often necessary in carrying
out job duties. Jobs are sedentary if walking and standing are required occasionally and
other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

[5] Plaintiff's testimony before the ALJ reflects his subjective view of his medical
condition, abilities, and limitations; it is not a factual finding of the ALJ or this Magistrate Judge.

paperwork; the physical requirements of the job included walking and lifting (Tr. 54). Because of his ankle injury, Plaintiff's employer allowed him use of a golf cart in 2001 (Tr. 54, 58-59). His duties became primarily supervisory, and he was not required to lift very heavy objects; he would stand for one out of eight hours and sit for approximately four, for less than one hour at a time before he returned to the floor in his golf cart (Tr. 55, 59). Without the golf cart, Plaintiff's job would have required him to lift nearly 100 pounds; get in and out of hi-low trucks; and, operate the trucks with his legs (Tr. 67).

Plaintiff was laid off in July of 2009 (Tr. 51-53). He received unemployment benefits through January of 2011 (Tr. 53).

Plaintiff could not work because the arthritis in his left ankle radiated up through his body's left side, impeding his ability to stand, walk, and lift weight (Tr. 57-58). Before he was laid off, he was able to walk the ten feet between his car and his office; once at work, he used the golf cart to get around (Tr. 58). Plaintiff could stand for 10 to 15 minutes on both feet and regularly lift a full gallon jug with both hands, though it would hurt if he used his left hand; he had trouble gripping with his left hand because of the throbbing pain that coursed through the left side of his body (Tr. 63-64, 68-69). Plaintiff could shower, bathe, and dress himself, but he had trouble getting out of the bathtub (*Id.*). His pain was a five out of ten when he was resting, but when he tried to be active his ankle swelled and caused his pain to reach a ten (Tr. 58, 67-68). Plaintiff wore a brace, but stopped because it aggravated his ankle; he then wore a shoe one size larger to accommodate the swelling (Tr. 60).

Plaintiff had high blood pressure, which had interfered with his ability to work since 2007: he experienced blurred vision, headaches, and his medications made him very drowsy and weak; Trazodone especially impaired his ability to move around (Tr. 60, 70). Plaintiff also had

-7-

bronchitis, a condition that made it difficult for him to walk: after walking 25 or 30 feet, or ascending seven stairs, he was out of breath (Tr. 57-58, 69). Plaintiff stopped smoking (and drinking) in 2005 and used an albuterol inhaler approximately three times a day (Tr. 62, 65). Plaintiff's sleep apnea – which he had since 2000 – was also debilitating: he might fall asleep while sitting and talking to someone, and he was unable to stay awake during a full eight-hour workday (Tr. 63, 69-70). But he could not afford to buy a machine for his condition (Tr. 67). Plaintiff required naps or rests three to four times a day (Tr. 70).

Plaintiff was previously on morphine, but it impeded his ability to work; so, he began taking Vicodin (Tr. 61). It alleviated his pain, and made him feel more alert and better able to work (*Id.*).

Plaintiff used to enjoy sports and motorcycle riding, but had been unable to pursue those passions since 2001 (Tr. 70-71). He lived with his girlfriend, who did all of the shopping, cooking, cleaning, and laundry; Plaintiff was unable to help (Tr. 53, 63). While at home, Plaintiff spent most of his time with his young son or watching television or movies with his leg propped up (*Id.*). He never finished movies, however, because he would fall asleep (*Id.*). Plaintiff did not drive – he lost his driver's license in 2005 when he received a DUI – but he was able to ask friends for a ride when he needed one (Tr. 62-63). At home, Plaintiff elevated his legs throughout the day (Tr. 69). His church also accommodated him: he sat on the end of the pew and was given a stool on which to prop up his leg (Tr. 68). Plaintiff felt fine as long as his leg was propped up (Tr. 69).[6]

---

[6] Though, Plaintiff failed to specify how long he can sit:

Q: Okay. Do you elevate your legs at all when you're at home?

2.        **Relevant Medical Evidence**

a.  **Before Alleged Onset**

On July 12, 2001, Plaintiff presented to the emergency room: he had fallen down several stairs and dislocated his ankle (Tr. 182, 185-186). He required ankle surgery and treatment of a fracture blister (Tr. 199-221). On November 28, 2001, Plaintiff was discharged from outpatient physical therapy because he failed to appear for three consecutive appointments (Tr. 264-66).

On March 22, 2006, Plaintiff began treating with David Steinberger, M.D. (Tr. 274). He presented in no apparent distress; Dr. Steinberger advised smoking cessation, a change in blood pressure medication, and refilled Plaintiff's Vicodin prescription (*Id.*). On June 15, 2006, Plaintiff returned complaining of a throbbing headache, with concomitant blurred vision and dizziness; it went away when Plaintiff took Vicodin for his ankle (Tr. 275). He also reported that his hands went numb after riding his motorcycle for an hour (*Id.*). Dr. Steinberger noted no apparent distress, found Plaintiff's extremities to be normal, ordered blood work, continued his Vicodin dosage, and listed the following other medications: Verapamil (high blood pressure), Hydrochlorothiazide (a water pill), Midrin (pain relief, generally used to treat headaches), and Atenolol (high blood pressure) (*Id.*). On September 29, 2006, Plaintiff complained of left foot

A: Yes.

Q: Okay. How often do you do that?

A: Throughout the day.

Q: Okay. And how long do you, normally are you able to sit for a period of time without getting up and moving around?

A: As long as I have my leg propped up, I'm all right.

(Tr. 68-69).

pain, aggravated by being on his feet at work; Dr. Steinberger continued Plaintiff on Vicodin, two to three times daily (Tr. 276).

On February 27, 2007, Plaintiff's left foot and ankle were evaluated by Richard Krugel, M.D.; Plaintiff reported that his job required him to be on his feet most of the time (Tr. 312). Examination revealed minimal soft tissue swelling; some tenderness over the talonavicular joint; major tenderness beneath the heel; intact neurovascular status; and, benign healed wounds (*Id.*). X-rays showed significant degenerative disease at the talonavicular joint (*Id.*). Dr. Krugel diagnosed degenerative arthritis in Plaintiff's left foot, secondary to previous trauma, and prescribed Naprosyn, 500mg twice daily, to see if it would change Plaintiff's symptomalogy (*Id.*). Plaintiff was to report back in one month (*Id.*).

April 3, 2007 treatment notes indicate that Plaintiff's hypertension symptoms were constant at seven out of ten, but improving; he reported no chest pain, headache, or shortness of breath (Tr. 277). Plaintiff also indicated no change in his foot or ankle, and discussed smoking cessation with Dr. Steinberger (*Id.*). On July 24, 2007, treatment notes indicate that Plaintiff reported no chest pain or shortness of breath; his left ankle and heel pain was stable, and his Vicodin prescription remained the same (Tr. 282-83).

On February 27, 2008, Plaintiff presented with a sudden onset of constant shortness of breath; the problem was worsening (Tr. 284). His left ankle and foot pain exhibited no associated symptoms, and he was taking medications regularly and keeping appointments (*Id.*). On September 25, 2008, Plaintiff reported that his foot and ankle pain was constant, but he "continue[d] to believe that his life is improved on [Vicodin] and he has an easier time completing his ADLs . . . and his vocation"; plantar facial fibromatosis was stable (Tr. 286). Dr. Steinberg noted that Plaintiff was taking medications regularly, but not keeping his appointments

(*Id*.). Dr. Steinberg indicated that Plaintiff's hypertension was poorly controlled: Plaintiff continued to report no chest pain, heart palpitations, or shortness of breath, but he was not taking medications regularly and not keeping his appointments (Tr. 286).

On October 1, 2008, X-rays ordered by Dr. Steinberg revealed arthritis of both shoulders and right ankle, but his right knee was normal (Tr. 288).

On December 23, 2008, Plaintiff presented for sleep apnea; he reported the condition was now severe, and had started gradually over years' time (he had had a positive sleep study in 2001) (Tr. 290). Dr. Steinberg urged its treatment: Plaintiff must lose weight, and surgery would be a last resort (*Id*.). Plaintiff was told to "quit smoking asap [sic]" (*Id*.). Plaintiff also reported back pain and numbness in his left foot; he was continued on Vicodin three times daily for pain (Tr. 291). Again, treatment notes indicate that Plaintiff believed his life was improved on Vicodin; he had an easier time completing ADLs and his vocation (*Id*.). Blood work taken that day revealed high cholesterol (Tr. 289). On March 18, 2009, Plaintiff walked with a limp and complained of severe, constant lower back pain, radiating into his right side, including his right lower extremities; examination revealed swelling and tenderness of his right foot, primarily at his old incisions (Tr. 295-96). Plaintiff was advised to continue his Vicodin and work on weight reduction (Tr. 294). On May 28, 2009, Plaintiff presented with a hacking, persistent cough (Tr. 298). Dr. Steinberg noted Plaintiff's hypertension was poorly controlled: he continued to smoke and was not following a diet (*Id*.).

### b.  After Alleged Onset

On September 18, 2009, Dr. Steinberg noted that Plaintiff continued to find his life improved with Vicodin; blood work revealed problematic blood sugar levels (Tr. 300, 302).

On May 21, 2010, Plaintiff presented to Bina Shaw, M.D., for a consultative examination (Tr. 303-05). Plaintiff reported a history of asthma, chronic COPD, and left knee pain; his primary complaint was left ankle pain with prolonged walking and standing (Tr. 303). Dr. Shaw noted that Plaintiff was a smoker and was being treated for hypertension, but his condition was uncontrolled due to noncompliance with medications (*Id.*). Examination revealed full range of motion in both knees, hips, and ankles; slightly decreased inversion and eversion in the left ankle; and, normal, steady gait, with no use of cane and no limp (Tr. 304). Dr. Shaw opined that Plaintiff could work eight hours a day: he could sit, stand, walk, bend minimally, and lift at least 15 pounds; he should be allowed to rest for 10 minutes every hour (Tr. 305).

On June 3, 2010, Plaintiff's hypertension was poorly controlled (Tr. 336). Dr. Steinberger ordered smoking cessation counseling – Plaintiff had tried to stop smoking, but continued to smoke a pack a day – and advised Plaintiff to wear his CPAP mask for sleep apnea and continue current treatment for left foot and ankle (it was again noted that Plaintiff believed Vicodin improved his life, ADLs, and vocation) (Tr. 336-40).

On June 10, 2010, Charles Edmonds, M.D., evaluated Plaintiff's case (Tr. 86-88). He opined Plaintiff could occasionally lift up to 20 pounds; frequently lift up to 10 pounds; stand and sit for six hours in an eight-hour workday; and, was not limited in his ability to push and/or pull with hand and/or foot controls (Tr. 86). Dr. Edmonds opined Plaintiff could perform his past relevant work (as it was actually performed) (Tr. 87).

On January 24, 2011, Dr. Steinberger completed a questionnaire related to Plaintiff's condition (Tr. 353-56). He had seen Plaintiff a total of three times between July 2009 and January 24, 2011, most recently on June 17, 2010 (Tr. 353). He noted that Plaintiff complained of severe ankle pain and fatigue; he found these complaints credible (Tr. 354). He opined that

-12-

Plaintiff could not perform sedentary or light work, and his impairments were expected to last a lifetime (Tr. 355-56). Dr. Steinberger's corresponding physical RFC assessment indicated that Plaintiff could sit for two hours (due to Plaintiff's fatigue and ankle pain), stand and/or walk for two hours, occasionally lift up to 50 pounds, and use only his right foot for repetitive movements; he required complete freedom to rest frequently without restriction (even with a sit/stand option), needed to lie down or rest for substantial periods of time during the day to relieve pain and fatigue, but did not need to elevate his lower extremities (Tr. 357-59).

### 3.     Vocational Expert

The ALJ asked a vocational expert ("VE") to assume a hypothetical individual of Plaintiff's age, education, and past work experience who could perform light work that involved lifting up to 20 pounds occasionally; lifting or carrying up to 10 pounds frequently; standing or walking for approximately six hours in an eight-hour workday; sitting for approximately two hours in an eight-hour workday with normal breaks; and, the occasional operation of foot controls on the left (Tr. 74). The VE testified that such an individual could perform Plaintiff's past relevant work (Tr. 75).

The ALJ next asked the VE to consider the same hypothetical, but further limited the individual to *no* operation of foot controls with the left foot; the VE did not change her testimony, noting that the individual could still use his right foot in the floor supervisor position (*Id.*).

Third, the ALJ asked the VE to assume that the hypothetical individual was further restricted to sedentary work that involved lifting up to 10 pounds occasionally; standing or walking two hours in an eight-hour workday; and, sitting for six hours in an eight-hour workday

-13-

with a sit/stand option and normal breaks (Tr. 75). The individual would not be off task more than 10 percent of the workday (*Id.*). The VE testified that the individual could not perform Plaintiff's past relevant work as a carwash attendant due to the standing limitation; he could nevertheless perform the floor supervisor position (Tr. 76). The VE added that the individual could perform sedentary, unskilled work as a video surveillance monitor, an information clerk, and an assembler (Tr. 76-77).

Fourth, the ALJ further restricted the hypothetical individual to sedentary work, with a sit/stand opinion; the individual would be required to elevate their left leg on a stool from time to time, but not at heart level (Tr. 77). The VE testified that if the stool were at or above hip height, no jobs would be available; below hip level, however, the same jobs previously identified in the VE's testimony could be performed (*Id.*).

In a fifth and final hypothetical, the ALJ added a requirement that the individual be allowed to be off task for ten minutes of every hour in order to rest (*Id.*). The VE testified that such a limitation would preclude competitive employment (*Id.*).

Plaintiff's counsel then presented his own hypothetical to the VE: the individual could sit for two hours of an eight-hour workday, stand for two hours, and walk for two hours; never use his left foot or leg to do any push-pulling; and, required frequent resting, including a need to lie down because of fatigue from medication side effects (Tr. 78). The VE testified that the individual would be precluded from any competitive work (Tr. 79).

-14-

### D. *Plaintiff's Claims of Error*

#### 1.    The ALJ's Assessment of Medical Opinion Evidence

##### a. Dr. Steinberger's Opinion

Plaintiff argues that the ALJ failed to properly evaluate the opinion of his treating physician, Dr. Steinberger. Plaintiff first points to Dr. Steinberger's opinion that he could not perform sedentary work. But the Sixth Circuit recently made clear that opinions on issues reserved to the Commissioner are not entitled to any particular weight:

> [A] treating physician's opinion is only entitled to . . . deference when it is a *medical* opinion. If the treating physician instead submits an opinion on an issue reserved to the Commissioner – such as whether the claimant is disabled, unable to work, the claimant's RFC, or the application of vocational factors – his decision need only explain the consideration given to the treating source's opinion. The opinion, however, is not entitled to any particular weight.

*Johnson v. Comm'r of Soc. Sec.*, __ F. App'x __, 2013 WL 5613535, at *7 (6th Cir. Oct. 15, 2013) (emphasis in original) (internal citations and quotations omitted). Nevertheless,

> [u]nder the pertinent regulations, more weight is generally given to the opinion of a treating physician. As long as the treating physician's opinion regarding the nature and severity of the claimant's impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence, it will be given controlling weight.

*Id.*; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376 (6th Cir. 2013) reh'g denied (May 2, 2013). Here, the ALJ accorded Dr. Steinberger's opinion "some weight":

> I give Dr. Steinberger's opinion some weight and find that the claimant's chronic ankle pain limits him to work that is less than sedentary with a sit/stand option. However, I do not find that the claimant is limited to sitting [two] hours per day because the claimant demonstrated the ability to sustain full-time work at a sedentary level from his injury in 2001 until he lost his job due to downsizing in July 2009. Dr. Steinberger noted that the symptoms were present since 2001, and he did not note any worsening during the three office visits from July 2009 through January 2011. In fact, treatment notes from the claimant's last office visit in June 2010 indicate the claimant "continues to believe that his life is improved

-15-

on medication and he has an easier time completing his activities of daily living . . . and his vocation.[7]

(Tr. 16).

Although the ALJ does not mention it here, the objective medical evidence on record is minimal: it includes Dr. Krugel's 2007 X-rays of Plaintiff's left foot and ankle, showing significant degenerative disease at the talonavicular joint (Tr. 312), and the results of blood work showing high cholesterol (*See, e.g.,* Tr. 289). Plaintiff puts stock in the ALJ's apparent neglect of objective medical evidence, indicating that his ankle impairment was the result of a degenerative condition, which "by definition . . . worsens over time" (Dkt. No. 14 at p. 15).[8] But, Plaintiff points only to Dr. Krugel's 2007 X-ray, which the ALJ discussed between Steps Three and Four (Tr. 15). While it is true that Dr. Krugel's findings are significant, simply because a condition can be expected to worsen over time does not mean that the ALJ is obligated to assume – without more than one X-ray obtained some two years prior to Plaintiff's alleged onset date – that a condition which Plaintiff did not previously find work preclusive has since progressed to that point. It is also worth noting that despite Dr. Krugel's findings, the record is devoid of any evidence that Plaintiff complied with his recommended Naprosyn regimen (Tr. 312), or followed up with him at all.

Consistent with the ALJ's findings, a careful review of Dr. Steinberger's treatment notes indicates no worsening of Plaintiff's ankle condition throughout the course of treatment (Tr. 16). Plaintiff points to the March 2009 treatment notes, which indicate he complained of persistent

---

[7] What the ALJ does not mention, however, is that Plaintiff was no longer working at this time. This language appears to be oft-repeated boilerplate utilized by Dr. Steinberg throughout Plaintiff's treatment records (*See, e.g.,* Tr. 286, 291, Tr. 336-40). Whether this should detract from Dr. Steinberger's opinion is left up to the ALJ on remand.

[8] All page numbers refer to CM/ECF pagination.

-16-

severe back pain and swelling and tenderness in his *right* foot (Dkt. No. 14 at p. 15, citing Tr. 294, 296). Even if Plaintiff had actually reported symptoms in his *left* foot and this were simply an error in notation, it is the only such notation in the treatment records – dated *before* the alleged onset date, and therefore while Plaintiff was still working – and does not, standing alone, suffice to show deterioration in Plaintiff's condition.

Moreover, Dr. Steinberger's opinion that Plaintiff could sit for only two hours in an eight-hour day – but does not require that he elevate his lower extremities with prolonged sitting – is inconsistent with Plaintiff's testimony: as Plaintiff himself notes in his motion, he "specifically testified that he could no longer work because it is difficult for him to *stand, walk and lift* due to arthritis pain in his ankle" (Dkt. No. 14 at p. 15, citing Tr. 57). He later testified that so long as his leg is elevated, he feels fine sitting (Tr. 69). This limitation is also inconsistent with Dr. Shaw's opinion, which found Plaintiff able to "work eight hours a day: he could sit, stand, walk, bend minimally, and lift at least 15 pounds" (Tr. 305).

Moreover, it is unclear why Plaintiff would suggest that a worsening in his ability to stand and walk demonstrates the ALJ erred in his assessment of Dr. Steinberger's opinion: Dr. Steinberger opined that Plaintiff could walk for two hours and stand for two hours (Tr. 357-59); these are the precise limitations incorporated into the ALJ's RFC (Tr. 14).

As such, Dr. Steinberger's opinion was not entitled to controlling weight.

What remains, then, is Plaintiff's assertion that the ALJ failed to articulate good reasons for the weight given to Dr. Steinberger's opinion:

> If the ALJ chooses not to give the treating physician's opinion controlling weight, he or she must determine what weight to give it by looking at various factors, including the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability of the opinion; its consistency with the record as a whole; the specialization of the

-17-

physician or doctor rendering the opinion; and other factors that support or
contradict the opinion.

*Johnson*, 2013 WL 5613535, at *7 (internal citations and quotations omitted).

> The Commissioner is required to provide good reasons for discounting the weight
> given to a treating-source opinion[,] . . . supported by the evidence in the case
> record[] and . . . sufficiently specific to make clear to any subsequent reviewers
> the weight the adjudicator gave to the treating source's medical opinion and the
> reasons for that weight. This procedural requirement ensures that the ALJ applies
> the treating physician rule and permits meaningful review of the ALJ's
> application of the rule.

*Gayheart*, 710 F.3d at 376.

Plaintiff implies that the ALJ failed to give sufficient credence to Dr. Steinberger's

opinion because of the frequency and duration with which Plaintiff saw Dr. Steinberger: at least

20 times between 2006 and January 2011 (Dkt. No. 14 at p. 12). It is true that Dr. Steinberger's

approximately five year treatment relationship with Plaintiff "gives him a unique perspective

which is not afforded to other medical providers" (Dkt. No. 19-1 at p. 3). But, the ALJ was

reasonable to pay special attention to the fact that Plaintiff treated with Dr. Steinberger only three

times between his alleged onset date and January of 2011 (Tr. 16). Three visits over the course of

the approximately one and a half years during which Plaintiff alleges he endured disabling

symptoms is worth noting, in part, because it limits the consistency with which Dr. Steinberger

could evaluate the extent of Plaintiff's impairments. *See* 20 C.F.R. § 404.1527 (c)(3) ("[t]he

more a medical source presents relevant evidence to support an opinion, particularly medical

signs and laboratory findings, the more weight we will give that opinion").

Thus, the ALJ – in placing special emphasis on Plaintiff's uninterrupted work history and

sparse treatment history through the date he was laid off – focused his reasoning for discounting

Dr. Steinberger's opinion on its general consistency and supportability with the record as a

whole (Tr. 16). *See* 20 C.F.R. § 404.1527(c)(4) ("[g]enerally, the more consistent an opinion is

-18-

with the record as a whole, the more weight we will give to that opinion"). As Defendant points

out, the ALJ did not need to discuss every factor listed in the regulations, particularly those

factors not especially relevant to the unique set of circumstances surrounding Plaintiff's claims.

*Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 805 (6th Cir. 2011) ("the treating-source

rule is not a procrustean bed, requiring an arbitrary conformity at all times" (internal citations

and quotations omitted)). Moreover, after a careful review of the record, this Magistrate Judge is

satisfied that the ALJ did not neglect to consider any evidence on record that would better

support Dr. Steinberger's opinion as it relates to Plaintiff's ability to sit, stand, and walk. With

respect to those limitations, the ALJ's reasons were sufficient.

However, the ALJ failed to discuss why, despite affording Dr. Steinberger's opinion

"some weight," he rejected his recommendation that Plaintiff have complete freedom to rest

frequently, even in a job that provided a sit/stand option (Tr. 357-59). Accordingly, Plaintiff

argues that the ALJ erred in his assessment of Dr. Steinberger's opinion because he neglected to

explain his reasons for rejecting this limitation. The ALJ assessed Dr. Shaw's opinion with

analogous dismissiveness. As discussed further below, this Magistrate Judge finds the ALJ's

assessment of Plaintiff's fatigue and associated need to rest to be reversible error.

### b.  Dr. Shaw's Opinion

Plaintiff likewise argues that the ALJ erred in his assessment of Dr. Shaw's opinion:

though he afforded it "some weight," the ALJ failed to mention why he did not incorporate into

his RFC her recommended 10-minute hourly break (Dkt. No. 14 at pp. 10, 22), a crucial question

because the VE testified that such a limitation would preclude competitive employment (Tr. 77).

The regulations mandate that "the [ALJ] must explain . . . the weight given to the

opinions of [] State agency medical or psychological consultant[s] . . . as the [ALJ] must do for

-19-

any opinions from treating sources, nontreating sources, and other nonexamining sources[.]" 20 C.F.R. § 416.927(e)(2)(ii). Thus, the ALJ must weigh the opinions of medical sources such as Dr. Shaw, and elaborate his reasoning for that weight while mindful of the factors utilized in the evaluation of treating physicians' opinions: among them, the supportability and consistency of the opinions. 20 C.F.R. § 416.972(c); *see, e.g., Gayheart*, 710 F.3d at 376; *Sparck v. Comm'r of Soc. Sec.*, No. 11-10521, 2012 WL 4009650, at *9 (E.D. Mich. Aug. 23, 2012) (although the ALJ reserves the right to decide a claimant's RFC, he must rely on medical opinions to support his conclusions regarding a claimant's non-exertional limitations). And although "it is well settled that[] '[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party,'" *Kornecky*, 167 F. App'x at 507 (internal citation omitted), "[t]he fundamental question . . . is whether the ALJ's decision is supported by substantial evidence," *Dykes ex rel. Brymer v. Barnhart*, 112 F. App'x 463, 468 (6th Cir. 2004).

With respect to Dr. Shaw's opinion, the ALJ simply stated: "I give this opinion some weight because it is consistent with the record as a whole" (Tr. 16).

Meanwhile, with respect to Plaintiff's fatigue, the ALJ only recalled Plaintiff's testimony: "[Plaintiff] stated that he has hypertension and his medication makes him feel weak. He stated that these symptoms began in approximately 2007" (Tr. 14). Indeed, Plaintiff did testify that his high blood pressure began to interfere with his ability to work in 2007, and noted that his medications make him weak and impair his movement (Tr. 60, 70). He also testified that he naps three to four times a day and regularly falls asleep while watching movies, and stated in an April 24, 2010 adult function report that fatigue was among his medications' side effects (Tr. 63, 70, 160).

-20-

Defendant notes, however, that no complaints of fatigue appear in treatment notes (Dkt. No. 18 at p. 16). True as this may be, it should not be a reason to excuse the ALJ's failure to thoughtfully address Plaintiff's claimed fatigue: Dr. Steinberger's opinion makes quite clear that Plaintiff's fatigue contributed considerably to his assessment of Plaintiff's condition (Tr. 353-56).[9] It is worth discussing whether this discrepancy is simply the result of treatment notes that lack detail.[10]

As discussed above, Dr. Steinberger rendered an opinion on Plaintiff's need to rest which, similar to Dr. Shaw's, did not receive its proper consideration in the ALJ's assessment. In this sense, these two opinions are consistent. How the ALJ evaluated Dr. Shaw and Dr. Steinberger's opinions alongside the third opinion of record – consultative non-examining physician Dr. Edmonds, whose June 10, 2010 opinion did not include a recommendation that Plaintiff be allowed to rest – is unclear (Tr. 86-88). The ALJ failed to mention his assessment at all.

Where both Plaintiff's treating physician and a consultative examining physician opined that Plaintiff required a length of time to rest that was greater than that incorporated into the ALJ's RFC – and where the ALJ failed to offer any substantive discussion of the Plaintiff's complaints of fatigue – this Magistrate Judge cannot surmise how the ALJ determined that an RFC providing that Plaintiff be off task for no more than 10% of the workday was sufficient to account for his limitations.  Given the VE's testimony (Tr. 77), the difference between a need to

---

[9] Nevertheless, this Magistrate Judge cannot assume Plaintiff's hypertension medications to be the sole cause of Plaintiff's apparent need to rest; the opining sources – Dr. Shaw in particular, whose opinion was not as clearly connected to Plaintiff's medication side effects – could just as well have found Plaintiff in need of rests to accommodate other difficulties, such as his need to be off of his feet. To the extent that the ALJ is similarly unsure, the regulations provide for the proper remedy. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.92(c)(3).

[10] *See supra* n. 7.

-21-

rest for 10 minutes every hour and a provision allowing for an individual to be off task 10% of the workday is certainly material. The ALJ should reconcile this discrepancy, and, at the very least, explain what led him to afford "some weight" to the pertinent portions of Dr. Steinberger and Dr. Shaw's opinions. As questionably credible as the ALJ may have found Plaintiff himself, he was nevertheless required to evaluate the medical opinion evidence of record thoroughly.

### 2.      Plaintiff's Remaining Arguments

Plaintiff's argument next asserts additional errors: namely, that (1) substantial evidence does not support the ALJ's RFC; (2) the ALJ failed to properly evaluate Plaintiff's credibility;[11] and, (3) the ALJ's presented a flawed hypothetical to the VE. However, because affording proper credit to the opining sources' recommendation that Plaintiff be permitted to rest throughout the workday may implicate other parts of the ALJ's analysis, including a potential finding of disability, this Magistrate Judge need not address these remaining arguments.

### IV.      CONCLUSION

Because the ALJ failed to properly consider the medical opinion evidence of record with respect to Plaintiff's need to rest, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, Defendant's motion for summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner for findings consistent with this recommendation, pursuant to sentence four of 42 U.S.C. § 405(g).

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as

---

[11] For example, Plaintiff specifically argues that the ALJ erred in his credibility determination because he failed to consider medication side effects of drowsiness (Dkt. No. 14 at p. 19 (CM/ECF)).

provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
Mark A. Randon
United States Magistrate Judge

Dated:  January 13, 2014

Certificate of Service

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, January 13, 2014, by electronic and/or ordinary mail.*

*s/Eddrey Butts*
*Case Manager for Magistrate Judge Mark A. Randon*